# IN RE: A SPECIAL INVESTIGATION NO. 224

[No. 202, September Term, 1982.]

*Decided April 7, 1983.*

The cause was argued before MOYLAN, LOWE and ADKINS, JJ.

*Deborah K. Handel, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Stefan D. Cassella, Assistant Attorney General,* on the brief, for appellant.

*Albert H. Turkus,* with whom were *Dow, Lohnes & Albertson, Alan J. Goldstein, Horowitz, Oneglia, Goldstein, Foran & Parker, P.A., David R. Addis, Dickstein, Shapiro & Morin, Joshua R. Treem* and *Schulman & Treem* on the brief, for appellees.

MOYLAN, J., delivered the opinion of the Court.

The message is clear and the model has been well described:

> "Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws."

The Supreme Court spoke those words in 1973 in *United States v. Dionisio,* 410 U.S. 1, 17, 93 S. Ct. 764, 35 L.Ed.2d 67, 81. One year later, *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561, 568-569 (1974), was equally emphatic about the independence of the grand jury:

> "Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry. The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials. 'It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by

doubts whether any particular individual will be found properly subject to an accusation of crime.' "

The Supreme Court has consistently recognized that the grand jury's function should not, except in the most extreme circumstances, be interrupted, interfered with, or monitored too closely. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *Blair v. United States,* 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919); *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906). Drawing sustenance from the same English common law tradition, Maryland has extended the same deference to the essentially unfettered functioning of the grand jury. *Bartram v. State,* 280 Md. 616, 374 A.2d 1144 (1977); *Bernard v. Warden,* 187 Md. 273, 49 A.2d 737 (1946); *In Re Report of Grand Jury,* 152 Md. 616, 137 A. 370 (1927); *Pick v. State,* 143 Md. 192, 121 A. 918 (1923); *Hooker v. State,* 98 Md. 145, 56 A. 390 (1903); *Owens v. Owens,* 81 Md. 518, 32 A. 247 (1895); *Blaney v. State,* 74 Md. 153, 21 A. 547 (1891).

Notwithstanding this clear message, the effort of the Attorney General to root out fraud in the medical assistance program of the State of Maryland has been thwarted, sidetracked, frustrated, and delayed by an exasperating, though talented, "full court press." On this occasion, the war on crime has encountered a "scorched earth" defense that has made the Attorney General pay dearly, in time and resources, for every inch that has grudgingly been yielded. While it would be pleasing to report that today's holding gets the investigation back on track and repairs the damage, that is regrettably probably not the case. It is more probably the case that the ingenious obstructionism that has led to this appeal; companion cases decided today, *In Re: Special Investigation No. 228,* 54 Md.App. 149, 458 A.2d 820 (1983) and *In Re: Special Investigation No. 237,* 54 Md.App. 201, 458 A.2d 450 (1983); *In Re: Special Investigation No. 236,* 295 Md. 573, 458 A.2d 75 (filed March 28, 1983); *In Re: Special Investigation No. 229,* 295 Md. 584, 458 A.2d 80 (1983); *In Re:*

*Special Investigation No. 195,* 295 Md. 276, 454 A.2d 843 (1983); *In Re: Special Investigation No. 242,* 53 Md.App. 360, 452 A.2d 1319 (1982); *In Re: Special Investigation No. 202,* 53 Md.App. 96, 452 A.2d 458 (1982), has accomplished everything that it realistically set out to accomplish — a year's delay. Hopefully, a series of firm holdings will at least help to foreclose future resort to such diversionary stratagems. The grand jury does not have to run an obstacle course.

The general background to this investigation has been well summarized by Judge Marvin Smith for the Court of Appeals in *In Re: Special Investigation No. 195,* 295 Md. 276, 454 A.2d 843 (1983):

> "On December 20, 1978, pursuant to the provisions of Maryland Constitution Art. V, § 3, Acting Governor Blair Lee, III, authorized and directed the Attorney General of Maryland to investigate, among other things, 'the administration of medical assistance under the State's Medicaid Program,' with power 'to present to any grand jury which may have jurisdiction over the matter any evidence and testimony that [the Attorney General might] consider necessary and appropriate to carry out this authorization and directive.' The letter specified that if criminal charges were brought the Attorney General was 'authorized to prosecute in any courts of this State such violations of the law as [might be] disclosed by the investigation with the full powers and authorities possessed by a State's Attorney.' On November 21, 1979, Governor Harry Hughes issued a similar letter. Pursuant to that authority the Attorney General has created what he calls 'the Medicaid Fraud Control Unit' of his office." (Brackets in original.)

In August, 1981, that newly created Medicaid Fraud Control Unit began an investigation of large-scale fraud on the part of a closely related hospital and nursing home (collectively, the Hospital) in Prince George's County, and of

its owners, administrators, and employees. On February 4, 1982, a search warrant was executed at the Hospital. As has been more fully described in the companion case of *In Re: Special Investigation No. 228,* 54 Md.App. 149, 458 A.2d 820 (1983), the administrators of the Hospital received, through counsel, advance notice that the searching team was on the way. In a frantic twenty minutes, numerous employees of the Hospital grabbed box after box of records from the room where those records were kept and hastily loaded them onto a pickup truck and into a blue Cadillac, both of which got away from the scene a scant six minutes before the arrival of the searching team. The fruits of the validly issued search arrant were destined for the investigating grand jury sitting in Baltimore, which had been pursuing this investigation for six months.

In an effort to determine first whether there had indeed been an obstruction of justice — a deliberate concealment of incriminating documents sought by the grand jury — and independently as a continuing part of the ongoing effort to discover evidence of fraud in the operation of the Hospital, the investigating grand jury issued over the course of three days (February 9, February 11, and February 16, 1982) summonses to nineteen employees of the Hospital. These nineteen persons were summonsed before the grand jury as witnesses.

In addition, the grand jury issued two subpoenas *duces tecum.* One was to the Director of Communications of the Hospital for the telephone and public address system paging logs kept for the specific date of February 4, 1982. This obviously was intended to show the telephone messages that flashed back and forth during the hour preceding the search and also the call that went out over the public address system for a particular maintenance man quickly to join the team that was hauling away the records. The other subpoena *duces tecum* was to a Mrs. H, an employee of the Hospital, to produce the various books and records that had been "stashed" in her blue Cadillac and which had not been found in the subsequent search of an outbuilding located on her nearby property.

On February 22, a series of motions, from a number of lawyers, collectively moved to quash all of the summonses and subpoenas in this case. Oral argument, but no evidentiary hearing, was held before a judge of the Criminal Court of Baltimore on March 2. On March 8, an order was filed by the judge in that court directing that all of the summonses and subpoenas be quashed. This appeal has followed from that order.

In argument before that judge, and in brief and argument before us, counsel for the appellees have pointed out quite properly that what is involved is not a matter of venue, which involves simply the question of where the trial shall take place, *State v. Jones,* 51 Md.App. 321, 443 A.2d 967 (1982), but rather a matter of territorial jurisdiction, which goes to the very validity of the charging document, *McBurney v. State,* 280 Md. 21, 371 A.2d 129 (1977). From the proper identification, however, of a possible future pretrial but post-indictment issue, counsel created a massive *non sequitur.* The hearing judge was bombarded, as we have been bombarded, with a barrage of references to Maryland case law. *McBurney v. State, supra; State v. Jones, supra; Urciolo v. State,* 272 Md. 607, 325 A.2d 878 (1974); *Peddersen v. State,* 223 Md. 329, 164 A.2d 539 (1960); *Kisner v. State,* 209 Md. 524, 122 A.2d 102 (1956); *Guarnera v. State,* 23 Md.App. 525, 328 A.2d 327 (1974); *Stewart v. State,* 21 Md.App. 346, 319 A.2d 621 (1974), *aff'd,* 275 Md. 258, 340 A.2d 290 (1975); and two bits of dicta from *State v. Williams,* 85 Md. 231, 36 A. 823 (1897), and *Parrish v. State,* 14 Md. 238 (1859). None of the cases, however, stands for the proposition for which they have all been cited as authority. Every one of those cases involved circumstances where an indictment had been filed. Every one of those cases, except *State v. Jones, supra,* involved circumstances where trial and conviction had followed. They all involved a timely filed, post-indictment challenge to the validity of the charging document based upon the alleged failure of territorial jurisdiction. Not one of them remotely involved an effort, let alone a successful effort, to inject such an issue

prematurely into the investigative stage of a grand jury's deliberations. At the hearing, however, the smokescreen worked.

If in the fullness of time indictments should be forthcoming, the occasion will be ripe for the party indicted, once he knows what the offense is for which he has been indicted, to bring any appropriate challenge he may have to the territorial jurisdiction of the charging authority. Such challenge will be brought under Md. Rule 736a, which provides, *inter alia,* for a motion asserting a "defect in the institution of the prosecution." At such time, the party with the requisite standing to raise such challenge will be the "defendant" as that term of art is defined by Md. Rule 702b: " 'Defendant' means a person who has been arrested for an offense or against whom a charging document has been filed." The time for filing such a challenge under Md. Rule 736b will be "after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 723" but before the expiration of thirty days from such time. Such time has not yet come to pass.

If it should turn out that the Hospital or any connected with it are indicted for Medicaid fraud, it may be determined, upon timely challenge by a proper party, that territorial jurisdiction over such an offense rests exclusively in Prince George's County. It may be determined, on the other hand, if the state-wide Medicaid program is found to be run out of the State office buildings on Preston Street in Baltimore, if it is found that funds are issued from such central headquarters, and if it is found that reports and returns are made to such central headquarters, that territorial jurisdiction over such offense rests exclusively in Baltimore City. It may be, if funds are disbursed from Annapolis, that territorial jurisdiction rests in Anne Arundel County. It may be determined that territorial jurisdiction rests concurrently in any of these subdivisions. Only time will tell.

If it should turn out that anyone is indicted for the obstruction of justice in making off with records that were

the object of a search warrant, it may be determined that territorial jurisdiction rests exclusively in Prince George's County, where the concealment took place. It may be determined that territorial jurisdiction rests exclusively in Baltimore City, the forum of the grand jury whose deliberations were unlawfully obstructed.[1] It may turn out that territorial jurisdiction rests concurrently in both subdivisions. Again, only time will tell.

At this juncture, what is clear is that there is no pending indictment subject to challenge in terms of territorial jurisdiction; there is no defendant with requisite standing to raise such a challenge; there is no way of judging a grand jury's product until the grand jury has had the opportunity to finish its production. Pertinent is *United States v. Dionisio,* 410 U.S. 1, 16-17, 93 S.Ct. 764, 35 L.Ed.2d 67, 80 (1973):

> "[A] sufficient basis for an indictment may only emerge at the end of the investigation when all the evidence has been received."

To the same effect is *Hale v. Henkel,* 201 U.S. 43, 65, 26 S.Ct. 370, 50 L.Ed. 652 (1906):

> "It is impossible to conceive that ... the examination of witnesses must be stopped until a basis is laid by an indictment formally preferred, when the very object of the examination is to ascertain who shall be indicted."

---

**1.** A substantial body of well-reasoned cases holds that the situs of the forum which is obstructed determines territorial jurisdiction, and not the location where the physical acts occur. United States v. Kibler, 667 F.2d 452 (4th Cir. 1982), held that jurisdiction over an obstruction of justice case properly lay in the District of Maryland, although the threats upon a witness which represented the obstruction had occurred in the District of Columbia. The Court held, at 454, "[T]he situs of the crime is the place of the judicial proceeding that the accused sought to thwart." *See also* United States v. Barham, 666 F.2d 521 (11th Cir. 1982) (an assault on a witness in Tennessee represented an obstruction of justice in Alabama, where the hearing was pending); United States v. Tedesco, 635 F.2d 902 (1st Cir. 1980); United States v. O'Donnell, 510 F.2d 1190 (6th Cir. 1975); United States v. Elliott, 446 F.Supp. 209 (D. Va. 1978). *Contra* United States v. Swann, 441 F.2d 1053 (D.C. Cir. 1971).

Absolutely dispositive of the present appeal is the fact that the parties who have moved to quash the grand jury summonses *ad testificandum* are witnesses — mere *witnesses.* The duty to testify has long been recognized as a basic obligation that every citizen owes his Government. *Blackmer v. United States,* 284 U. S. 421, 438, 52 S.Ct. 252, 76 L.Ed. 375 (1932). "[T]he longstanding principle that 'the public ... has a right to every man's evidence' ... is particularly applicable to grand jury proceedings." *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561, 570 (1974), is directly on point:

> "Furthermore, a witness may not interfere with the course of the grand jury's inquiry. He 'is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise, for this is no concern of his.' ... Nor is he entitled 'to challenge the authority of the court or of the grand jury' or 'to set limits to the investigation that the grand jury may conduct.' "

No case could speak more directly to the issue now before us than that of *Blair v. United States,* 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 679 (1919). It dealt, to be sure, with a challenge raised by witnesses to the constitutionality of the law that was the subject of a grand jury inquiry and not to territorial jurisdiction. It is a distinction without a difference, for the Supreme Court spoke broadly of the impotence of a witness to challenge the validity of the proceedings on any ground. Its message was clear, at 250 U.S. 279:

> "We do not think the present parties are so entitled, since a brief consideration of the relation of a witness to the proceeding in which he is called will suffice to show that he is not interested to challenge the jurisdiction of court or grand jury over the subject-matter that is under inquiry."

Lest any question the vitality of *Blair* because of age, we hasten to point out that it has been not simply cited but extensively quoted from, with approval, by both *United States v. Dionisio, supra,* in 1973 and *United States v. Calandra, supra,* in 1974. It has also been not simply cited but quoted from, with approval, by the Court of Appeals in *In Re: Special Investigation No. 185,* 293 Md. 652, 657, 446 A.2d 1151 (1982). If any of the persons summonsed to the grand jury in this case, Mrs. H for instance, feared that she was more of a suspect than a witness, such person was entitled to raise any Fourth Amendment or Fifth Amendment claim that was available, but no such claim was raised in this case. The limited nature of the available exemptions and the requirement that such exemptions be raised was dealt with explicitly in *Blair,* at 250 U.S. 281-282:

> "[T]he giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summonsed. . . . The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public. The duty, so onerous at times, yet so necessary to the administration of justice according to the forms and modes established in our system of government . . . is subject to mitigation in exceptional circumstances; there is a constitutional exemption from being compelled in any criminal case to be a witness against oneself, entitling the witness to be excused from answering anything that will tend to incriminate him. . .; some confidential matters are shielded from considerations of policy, and perhaps in other cases for special reasons a witness may be excused from telling all that he knows.
>
> But, aside from exceptions and qualifications — and none such is asserted in the present case — the witness is bound not only to attend but to tell what

he knows in answer to questions framed for the purpose of bringing out the truth of the matter under inquiry."

*Blair* underscored the point already made that the final product of the grand jury can only be judged at the conclusion of its labors, saying at 250 U.S. 282:

"As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning. *Hendricks v. United States,* 223 U.S. 178, 184."

*Blair* stressed the pivotal distinction between the eligibility of the subject of an indictment to raise claims and the impotency of a witness to do so, saying at 250 U.S. 282:

"He is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise, for this is no concern of his. *Nelson v. United States,* 201 U.S. 92, 115.

On familiar principles, he is not entitled to challenge the authority of the court or of the grand jury, provided they have a *de facto* existence and organization.

He is not entitled to set limits to the investigation that the grand jury may conduct."

The witnesses in this case have challenged the territorial jurisdiction of the grand jury. It is the lesson of *Blair* that they are incompetent to do so:

"In truth it is in the ordinary case no concern of one summoned as a witness whether the offense is within the jurisdiction of the court or not." *Id.*

That mere witnesses, who have no recognized interest in the validity of the grand jury's proceedings, have managed

to stall those proceedings for over one year is deeply to be regretted.

> *Order to quash summonses and subpoenas vacated;\* costs to be paid by appellees.*

---

\* Neither at the hearing below nor before us has counsel for either party raised any issue with respect to mootness. There are too many possibilities for us to take judicial notice of anything in this regard, even if we were so inclined.