IN RE: SPECIAL INVESTIGATION NO. 249

IN RE: SPECIAL INVESTIGATION NO. 250

[No. 133, September Term, 1982.]

*Decided June 27, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*M. Albert Figinski,* with whom were *Ira C. Cooke* and *Gregg L. Bernstein* on the brief, for appellants.

*Paul F. Strain, Deputy Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Stefan D. Cassella, Assistant Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. MURPHY, C. J., dissents and filed a dissenting opinion at page 209 *infra.*

As in *In Re Special Investigation No. 244,* 296 Md. 80, 459 A.2d 1111 (1983), decided a short time prior to this case, we have here a corporate entity landlord and a nursing home provider of medical assistance services caught up in the Attorney General's ongoing investigation of Medicaid fraud in Maryland. A subpoena duces tecum relative to each was issued by the Grand Jury of Baltimore City. The provider filed what became Misc. No. 249 below. The landlord filed Misc. No. 250. Each sought to quash the subpoena pertaining to it. Neither is situate in Baltimore City. As part of its motion the landlord recited:

> "Movant is not a provider of medicaid services; it has no medicaid provider status; it receives no medicaid funds; it is a landlord of [a nursing home] located in Prince George's County; it does no business in Baltimore City; it seeks no payments or reimbursements in Baltimore City; and it is not located in Baltimore City."

Each motion to quash was overruled. Each party appealed to the Court of Special Appeals. We granted the State's motion

for a writ of certiorari prior to consideration of the case by the Court of Special Appeals.

We are faced with the following questions: (1) whether the denial of the motion to quash is appealable; (2) whether the Attorney General has authority to act as prosecutor in this area; (3) whether the Grand Jury of Baltimore City has power to summon records of an entity located beyond the confines of Baltimore City; and (4) whether when a grand jury seeks to compel production of records from beyond its borders the procedures should be applied which were established in *In Re Grand Jury Proceedings,* 507 F.2d 963 (3d Cir.), *cert. denied,* 421 U.S. 1015 (1975), and *In Re Grand Jury Proceedings,* 486 F.2d 85 (3d Cir. 1973), commonly referred to as *"Schofield II"* and *"Schofield I,"* respectively.

As in *In Re Special Investigation No. 244,* the term of the grand jury has expired. No effort was made to have the grand jury continued beyond its term. Similar subpoenas have been issued by a subsequent grand jury, whose term has been extended. However, there is now no one to whom the subpoenas originally issued in this proceeding are returnable. Accordingly, the subpoenas must be quashed. See *In Re Special Investigation No. 229,* 295 Md. 584, 458 A.2d 80 (1983), and *In Re Special Investigation No. 195,* 295 Md. 276, 454 A.2d 843 (1983). As in *Special Investigation No. 244,* there is likely to be a recurrence of the issues here presented and upon the recurrence the same difficulty which prevented these issues from being heard in time is likely to again prevent a resolution. Hence, as we did in *No. 244* and upon the authority there stated, we shall discuss the questions presented.

For the reasons stated in *Special Investigation No. 244* we hold that the denial of the motion to quash is appealable, that the Attorney General has the authority to act as prosecutor in this area, and that the Grand Jury of Baltimore City has power to summon records of an entity located beyond the confines of Baltimore City.

In *Schofield I,* 486 F.2d 85, Mrs. Schofield was served with a subpoena to appear before a federal grand jury. The subpoena did not indicate what would be required of her at that appearance. When she appeared she was not asked to testify but was directed by the United States Attorney to submit handwriting exemplars and to allow her fingerprints and photograph to be taken. After conferring with her attorney, she refused to comply with these requests. The United States Attorney then requested the district court to direct her to comply, which it did. Upon her continued refusal to do these things she was held in civil contempt. The court said:

> "At all times during the proceedings in the district court Mrs. Schofield urged that before she be required to comply with the Government's requests (1) the Government state the purpose and necessity for requesting of Mrs. Schofield handwriting exemplars, fingerprints and photographs, and (2) that if the Government has in its possession documents allegedly signed by her, she be permitted to examine them. At all times during the proceedings below, and on this appeal, the Government has taken the position that it need disclose, either to the court or to the witness, no more than appears on the face of the grand jury subpoena." 486 F.2d at 88.

The court pointed out that *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L. Ed. 2d 99 (1973), and *United States v. Dionisio,* 410 U.S. 1, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973), "hold that the fourth amendment does not require any preliminary showing for the issuance of a grand jury subpoena, either to compel testimony, or to compel production of voice or handwriting exemplars. Neither [of those opinions], however, involves any question as to the propriety of the grand jury's investigation, the legitimacy of the purpose for issuing the subpoena, or any nonconstitutional objection to its enforcement." 486 F.2d at 89.

The court went on to say that federal grand juries "are for all practical purposes an investigative and prosecutorial arm of the executive branch of government." *Id.* at 90. Additionally, "although like all federal court subpoenas grand jury subpoenas are issued in the name of the district court over the signature of the clerk, they are issued pro forma and in blank to anyone requesting them." *Id.* It said that "although grand jury subpoenas are occasionally discussed as if they were the instrumentalities of the grand jury, they are in fact almost universally instrumentalities of the United States Attorney's office or of some other investigative or prosecutorial department of the executive branch." *Id.* Accordingly, the court said that "for all practical purposes [grand jury subpoenas] are exactly analogous to subpoenas issued by a federal administrative agency on the authority of a statute, without any prior judicial control." *Id.* It pointed out, "[T]he federal courts have never lent their enforcement machinery to an executive branch investigative body in the manner of a rubber stamp." *Id.*

The court recognized that a presumption of regularity attaches to grand jury proceedings and hence to a grand jury subpoena. Given that presumption, the party objecting to enforcement has the burden of making some showing of irregularity. *Id.* at 92. The court went on to say, "Certainly the fact of grand jury secrecy suggests that the party seeking enforcement of a grand jury subpoena be required to make some minimum showing of the existence of a proper purpose before it can trigger the enforcement machinery of the judicial branch." *Id.*

The court said in conclusion:

> "We need not in this case lay down inflexible procedures to govern all challenges to enforcement of any grand jury procedure, for the information here sought is both limited and unique. The Government wants only handwriting exemplars, fingerprints and a mug shot. It has no general right to any of these things. Authority for obtaining them exists, if at all, solely because they are somehow

relevant to the grand jury's investigation of an offense falling within its jurisdiction. In view of the fact that information which would justify obtaining the handwriting exemplars, fingerprints, and a mug shot, is in the Government's sole possession, we think it reasonable that the Government be required to make some preliminary showing by affidavit that each item is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose. We impose this requirement both pursuant to the federal courts' supervisory power over grand juries and pursuant to our supervisory power over civil proceedings brought in the district court pursuant to 28 U.S.C. § 1826(a)." 486 F.2d at 93.

Chief Judge Seitz in his concurring opinion said he believed "the government's disclosure, if the district court is satisfied as to its sufficiency, cannot be made the subject of an adversary hearing by the witness" which, he said, "would lead to the type of mini-hearing which the Supreme Court condemned in *Dionisio." Id.* at 94. He said he "emphasize[d] [his] position on this point because if [he] read the opinion of the court correctly, it does not negate the possibility that the minimal showing of proper purpose can be factually litigated by the witness." *Id.*

In *Schofield II,* 507 F.2d 963, the court analyzed the holding in *Schofield I:*

"Our holding in *Schofield I* did not require a showing of reasonableness, it did not require any determination of probable cause and it clearly did not require a hearing in every case.

"What *Schofield I* did require, however, was a minimum showing by affidavit *in every case* that each item sought was (1) relevant to an investigation, (2) properly within the grand jury's jurisdiction, and (3) not sought primarily for another purpose." 507 F.2d at 966 (emphasis in original).

In response to *Schofield I,* the Government had provided an affidavit in support of its enforcement motion. The affidavit stated that the witness had been subpoenaed, that she had been fully advised that she was a potential defendant in the grand jury's investigation, and that it was "essential and necessary to the ... Grand Jury investigation" that Schofield furnish "exemplars of her handwriting and/or handprinting, and ... permit that her photograph and fingerprints be taken" for the purpose of determining "whether or not the witness uttered any forged, falsely made, altered or counterfeited checks." The court held that the district court had correctly determined that this affidavit met the three-pronged requirement of *Schofield I.*

We have found but two jurisdictions which appear to follow *Schofield,* the District of Columbia and Pennsylvania. See *In Matter of Kelley,* 433 A.2d 704 (D.C. 1981), and *Robert Hawthorne, Inc. v. County Investigating,* 488 Pa. 373, 412 A.2d 556 (1980).

Opinions rejecting the *Schofield* procedure include: *In Re Slaughter,* 694 F.2d 1258 (11th Cir. 1982); *In Re Grand Jury Proceedings,* 691 F.2d 1384, 1387 (11th Cir. 1982) ("We decline to impose any undue restrictions upon the grand jury investigative process pursuant to this court's supervisory power."); *In Re Special Grand Jury No. 81-1,* 676 F.2d 1005, 1011, *vacated on other grounds,* 697 F.2d 112 (4th Cir. 1982) ("[W]e do not adopt the *Schofield* rule that a preliminary showing must be made for every grand jury subpoena."); *In Re Pantojas,* 628 F.2d 701, 705 (1st Cir. 1980) ("Although we believe that the procedures mandated by the Third Circuit have much to recommend them, especially as glossed by Chief Judge Seitz in his concurrence in *Schofield I,* 486 F.2d at 94, we decline to impose them on district courts within the circuit at this time. The practical responsibility for controlling grand jury excesses lies with the district court, on which the grand jury must rely for subpoena and contempt procedures. We have seen little to convince us that prosecutors are regularly overreaching or that the district courts have been insensitive to irregularities that may

occur. Without some convincing demonstration to us that these procedures are necessary to prevent systematic abuse, we are reluctant to give recalcitrant grand jury witnesses further opportunities for delay. District courts should, however, feel free to require such showings by the government as a means of assuring themselves that grand juries are not overreaching, or simply as a means of removing the issue of sufficiency of nexus from dispute."); *In Re Liberatore,* 574 F.2d 78, 83 (2d Cir. 1978) ("[T]he government does not in each and every case bear the constant burden of initially showing the relevance of the particular evidence sought to be produced by way of subpoena. . . . [T]he weakness of Liberatore's argument that the government must make a preliminary showing of relevance is revealed by the fact that the sole authority upon which he relies is . . . *Schofield II* . . . and, necessarily, also on its predecessor, . . . *Schofield I* . . . . Those decisions are predicated entirely upon the Third Circuit's supervisory powers over the conduct of civil proceedings within that circuit and upon the federal courts' supervisory power over grand juries and they are in no way whatever based on constitutional grounds. . . . It is equally clear that the *Schofield* standards do not constitute the law in this circuit . . . ."); *In Re Grand Jury Investigation,* 565 F.2d 318, 320 (5th Cir. 1977) (The court quoted from *United States v. Dionisio,* 410 U.S. 1, 17, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973), and its admonition against saddling "a grand jury with mini-trials and preliminary showings. . . ."); *In Re Grand Jury Proceedings, Tom Hergenroeder,* 555 F.2d 686 (9th Cir. 1977); and *Universal Manufacturing Company v. United States,* 508 F.2d 684, 686, n. 2 (8th Cir. 1975).

Records were sought here. Thus, the subpoenas here are factually different from that in *Schofield I.* Moreover, the courts which have followed the *Schofield* holdings are a distinct minority. We see no reason at this time to adopt a rule similar to that in *Schofield I.* In *Dionisio,* 410 U.S. 1, 17-18, the Supreme Court observed that if the grand jury "is even to approach the proper performance of its constitutional mission, it must be free to pursue its investigations

unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it."

> Remanded to the Circuit Court for Baltimore City with directions to quash the subpoenas duces tecum issued in this case; appellants to pay the costs.

*Murphy, C.J., dissenting:*

While I am in complete accord with the Court's disposition of the merits of this case, I would dismiss the appeal on the jurisdictional ground that the orders denying the motions to quash were not properly appealable as final judgments within the contemplation of Maryland Code (1980 Repl. Vol.), § 12-301 of the Courts and Judicial Proceedings Article.[1]

*In Re: Special Investigation No. 244,* 296 Md. 80, 459 A.2d 1111 (1983), involved, as here, an appeal from the denial of a motion to quash a grand jury subpoena. The Court there referred to the general Maryland rule that a final judgment from which an appeal may be taken is one which settles the rights of the parties or concludes the cause. The Court reasoned that because the proceeding to quash the subpoena was the only matter before the trial court the judgment was final and appealable under § 12-301 of the Courts Article since nothing remained before the court. In so concluding, the Court recognized that its holding was unsupported by any other state or federal jurisdiction. It relied in part upon a dissenting opinion in *In Re: Petition of Arlen Specter,* 455 Pa. 518, 317 A.2d 286 (1974), wherein the dissenting justices expressed the view that such an order was appealable because a person should not be obliged to decide whether he

---

1. Section 12-301 provides, in pertinent part:

   "Except as provided in § 12-302 [entitled Exceptions], a party may appeal from a final judgment entered in a civil or criminal case by a circuit court...."

should risk contempt in order to test the validity of a grand jury subpoena. In adopting this philosophy, the majority echoed the dissenting justice's position when it stated that "in this day and age a person should [not] be obliged to decide whether he should risk contempt in order to test the validity of a [grand jury] subpoena duces tecum . . . ." 296 Md. at 86.

The settled rule in other jurisdictions is that an order denying a motion to quash a grand jury subpoena is not appealable unless and until the person to whom the subpoena is directed refuses to comply and is adjudged in contempt. *See United States v. Ryan,* 402 U.S. 530, 91 S. Ct. 1580, 29 L. Ed. 2d 85 (1971); *Cobbledick v. United States,* 309 U.S. 323, 60 S. Ct. 540, 84 L. Ed. 783 (1940); *State v. Grover,* 387 A.2d 21 (Me. 1978); *Commonwealth v. Winer,* 380 Mass. 934, 404 N.E.2d 654 (1980); *Petition of Specter,* 455 Pa. 518, 317 A.2d 286 (1974); *State v. Threet,* 294 Or. 1, 653 P.2d 960 (1982). Of primary concern to these courts has been the effective administration of the criminal law. As the Supreme Court said in *Cobbledick:*

> "To be effective, judicial administration must not be leaden-footed. Its momentum would be arrested by permitting separate reviews of the component elements in a unified cause. These considerations of policy are especially compelling in the administration of criminal justice. . . . An accused is entitled to scrupulous observance of constitutional safeguards. But encouragement of delay is fatal to the vindication of the criminal law. . . .

> "In thus denying to the appellate courts the power to review rulings at *nisi prius,* generally, until after the entire controversy has been concluded, Congress has sought to achieve the effective conduct of litigation. For purposes of appellate procedure, finality . . . is not a technical concept of temporal or physical termination. It is the means for achieving a healthy legal system. As an instrument of such policy the requirement of

finality will be enforced not only against a party to the litigation but against a witness who is a stranger to the main proceeding. Neither a party nor a non-party witness will be allowed to take to the upper court a ruling where the result of review will be 'to halt in the orderly progress of a cause and consider incidentally a question which has happened to cross the path of such litigation . . .' Mr. Chief Justice Taft, in *Segurola v. United States,* 275 U. S. 106, 112. This is so despite the fact that a witness who is a stranger to the litigation could not be party to an appeal taken at the conclusion of the main cause." 309 U.S. at 325-26.

Regarding the grand jury particularly, the Court stated:

"The Constitution itself makes the grand jury a part of the judicial process. It must initiate prosecution for the most important federal crimes. It does so under general instructions from the court to which it is attached and to which, from time to time, it reports its findings. The proceeding before a grand jury constitutes 'a judicial inquiry,' *Hale v. Henkel,* 201 U. S. 43, 66, of the most ancient lineage. See *Wilson v. United States,* 221 U. S. 361. The duration of its life, frequently short, is limited by statute. It is no less important to safeguard against undue interruption the inquiry instituted by a grand jury than to protect from delay the progress of the trial after an indictment has been found. Opportunity for obstructing the 'orderly progress' of investigation should no more be encouraged in one case than in the other." *Id.* at 327.

Finally, the Court explained the reasoning behind application of different rules for court proceedings related to administrative agencies and for on-going grand jury proceedings:

"After the court has ordered a recusant witness to testify before [an administrative agency], there

remains nothing for it to do. Not only is this true, with respect to the particular witness whose testimony is sought; *there is not, as in the case of a grand jury or trial, any further judicial inquiry which would be halted were the offending witness permitted to appeal.* The proceeding before the district court is not ancillary to any judicial proceeding. So far as the court is concerned, it is complete in itself." *Id.* at 330 (emphasis added).

State courts have likewise recognized the detrimental effect appeals from orders denying motions to quash subpoenas would have on the functioning of the grand jury. In *State v. Threet, supra,* the Supreme Court of Oregon stated:

"Grand jury proceedings, which often require quick resolution, would be disrupted by allowing appeals from these orders. . . . Allowing appeals from [such] orders . . . might abort grand jury proceedings in some cases." 653 P.2d at 963.

Permitting a recalcitrant witness, absent a contempt citation, to take an immediate appeal from an order denying a motion to quash a grand jury subpoena is certain to have a devastating effect on the grand jury system in Maryland. That it will thwart the orderly business of the grand jury and possibly bring its proceedings to a complete standstill pending actual availability of critical testimony and records is equally plain. In view of these consequences, I share the view espoused by the cases that a contempt citation is an absolute prerequisite to the right to appeal — a prerequisite which is justified by "the necessity for expedition in the administration of the criminal law." *See United States v. Ryan, supra,* 402 U.S. at 533.

While appellate jurisdiction in this State is dependent upon a statutory grant of power, *Lohss and Sprenkle v. State,* 272 Md. 113, 321 A.2d 534 (1974), the authorizing statutes [2] do not specify what is a final appealable judgment

---

2. In addition to § 12-301 of the Courts Article, § 12-101 (f) of that article defines a final judgment as meaning "a judgment, decree, sentence, order,

or order; that determination is left to the case law. *Peat & Co. v. Los Angeles Rams,* 284 Md. 86, 394 A.2d 801 (1978); *Warren v. State,* 281 Md. 179, 377 A.2d 1169 (1977). In determining that an order denying a motion to quash a grand jury subpoena is immediately appealable, the Court, without considering the strong countervailing considerations of public policy so evident in this matter, has misapplied the general language of the rule that a final judgment for appeal purposes in Maryland is "one which settles the rights of the parties or concludes the cause." Unlike the cases which support the majority rationale, there remains, after the denial of a motion to quash, the further judicial inquiry of a grand jury — an inquiry which must come to a sudden halt under a rule which permits a reluctant witness to delay the inquiry for the all too long period frequently required before an appellate decision can be rendered. I would dismiss the appeal as not taken from a final judgment.

---

determination, decision, or other action by a court, including an orphans' court, from which an appeal, application for leave to appeal, or petition for certiorari may be taken."